UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

INTERNATIONAL CONFECTION
COMPANY, LLC,

        Plaintiff,

                                   Case No. 2:18-cv-1108
    v.                             JUDGE EDMUND A. SARGUS, JR.
                                   Magistrate Judge Chelsey M. Vascura

Z CAPITAL GROUP, LLC, *et al.*,

        Defendants.

## OPINON AND ORDER

    This matter is before the Court on Defendants Z Capital Group, LLC ("Z Capital Group")

and Z Capital Partners, LLC's ("Z Capital Partners") (collectively, "Z Capital" or "Defendants")

Motion for Summary Judgment.  (ECF No. 35.)  For the reasons stated herein, Defendants' Motion

is **GRANTED**.  (*Id.*)

## I. BACKGROUND

### A. The Parties

#### 1. Z Capital

    Defendants are both Delaware limited liability companies that principally operate in

Illinois.  Together, they form an "alternative asset manager"—Z Capital— which primarily invests

in two specific asset classes: private equity and credit. (Pl.'s Dep. of Matthew Kane, ECF No. 36-

1.)  As a private equity investor, Z Capital's ultimate objective is investing in entities that it will

sell at a profit.  (*Id.* at 52:2-4.)  To make those investments, it must raise a specific amount of

capital, which it solicits from outside investors (*i.e.,* "Limited Partners").  (Pl.'s Ex. A, ECF No.

36-1.)  All of the money that Z Capital raises for a specific investment project is "pooled" within

a Delaware limited partnership known as a "Fund."  (*Id.*)  Each Fund that Z Capital raises is managed by a "designated" general partner entity that Z Capital controls.  (*Id.*; Kane Dep. at 38:23-39:11.)

Whenever Z Capital uses its funds to make an investment, it does not have them do so directly.  (Kane Dep. at 25-32.)  Rather, it will often create various business entities (*e.g.*, holding companies) that fall underneath the Fund.  (*Id.*)  Those entities effectively act as "intermediaries" which funnel the Fund's capital into its intended investments—*e.g.*, its "portfolio" companies.  (*Id.*)  One of those portfolio companies is non-party Mrs. Fields Famous Brands, LLC ("Mrs. Fields Famous Brands"), which owns and controls both Mrs. Fields Confections, LLC ("MF Confections") and Mrs. Fields Franchising, LLC ("MF Franchising").  (Kane Dep. 22:15-25:7, 44:12-15; Kane Aff. at ¶ 8.)

### 2. ICC

Plaintiff International Confections Company, LLC ("ICC") is an Ohio limited liability company that was formed to acquire non-party Maxfield Candy Company ("Maxfield Candy"), a Utah corporation.  (Dep. of Michael Ryan, Ex. A, ECF No. 35-1.)  ICC's sole member is Michael Ryan, who resides in, and is a citizen of, Ohio.  (*Id.*; ECF No. 35-3.)  As of today, ICC remains "open" as an entity, but is inactive as a business.  (Ryan Dep. 5:3-7.)

### B. The 2013 Licensing Agreement and Consent to Collateral Assignment

In April of 2013, ICC purchased Maxfield Candy, which had a pre-existing licensing agreement with MF Franchising.  (Ryan Dep. 10:10-15.)  The next month, ICC and MF Franchising entered into a licensing agreement of their own (the "Licensing Agreement").  (Pl.'s Ex. A, ECF No. 1-1.)  The Licensing Agreement, in relevant part, granted ICC "the irrevocable exclusive right and license to use" MF Franchising's trademarks, trade names, service marks, and

recipes to manufacture, market, and sell certain "Royalty Bearing" candy products ("Royalty Bearing Products") through "Designated Distribution Channels" in a specified "Territory" until December 31, 2030. (*Id.* at PageID #13, 23.)  In exchange, ICC would, inter alia, "remit" to MF Franchising the "accrued and unpaid royalties" of the Royalty Bearing Products it sold on a specified schedule, pay interest on any overdue royalty payments, and periodically provide MF Franchising with a certified report of its net sales. (*Id.* at PageID #14-17; ECF No. 35 at PageID #254.)  Pursuant to subsection 17(b)(ii) of the Licensing Agreement, MF Franchising reserved the right to terminate the Agreement if ICC failed to perform

> any material term or condition of this Agreement . . . and such default continues unremedied for thirty (30) days after the date on which ICC receives written notice of default, unless such remedy cannot be accomplished in such time period and ICC has commenced diligent efforts within such time period and continues such effort until the remedy is complete.

(Pl.'s Ex. A, ECF No. 1-1 at PageID #23.)

When ICC purchased Maxfield Candy, it pledged its rights and interest in the Licensing Agreement as collateral. (Pl.'s Ex. B, ECF No. 1-2.)  Accordingly, on June 26, 2013, MF Franchising consented to and acknowledged Maxfield Candy's "collateral right, title, and interest in" the Licensing Agreement (the "Consent to Collateral Assignment"). (*Id.* at PageID #44.) Therein, MF Franchising promised to provide Maxfield Candy with a copy of any notice of default or termination that it sent to ICC. (*Id.* at PageID #47.)  It also agreed to provide Maxfield Candy at least thirty days to cure any default on ICC's behalf. (*Id.* at PageID #46.)

### C. MF Franchising's Termination of the 2013 Licensing Agreement

On August 26, 2014, MF Franchising notified ICC that it was in default of various obligations under the Licensing Agreement (the "Notice of Default"). (Def.'s Ex. E, ECF No. 35-5.)  According to the notice, ICC failed to timely provide MF Franchising with (i) the payment of certain royalties; (ii) the payment of interest on certain royalty payments that ICC had already

made; (iii) certified reports on ICC's net sales; (iv) a summary of the consumer complaints it had received "regarding the quality of the Royalty Bearing Products[;]" (v) a certificate of insurance; and (vi) "representative samples of all Royalty Bearing Products being sold" by ICC. (*Id.*)  The notice stated that ICC's "[f]ailure to cure any or all of these defaults within the times provided by the Agreement shall result in the termination of the [Licensing] Agreement." (*Id.*)

On September 26, MF Franchising notified ICC that it had not cured several of the defaults listed in the Notice of Default within the thirty-day period provided in the Licensing Agreement (the "Notice of Termination"). (Def.'s Ex. F, ECF No. 35-6.)  Accordingly, MF Franchising terminated the Licensing Agreement in full. (*Id.*).

**D. MF Confections' 2014 Purchase of ICC's Assets**

Before MF Franchising terminated the Licensing Agreement, ICC secured several lines of credit from various banks, including the Utah-based Transportation Alliance Bank ("TAB Bank"). After the Agreement was terminated, TAB Bank sued ICC in Utah state court (the "Utah State Court") for breaching their loan agreement and related payment guarantee. *Transp. All. Bank v. Int. Confections Co.¸ LLC*, 2017 UT 55, ¶ 2, 423 P.3d 1171, 1172.  Several of ICC's other creditors caught wind of this lawsuit and subsequently intervened. *Id* at ¶ 3.

On November 13, 2014, the Utah State Court appointed Kent Goates (the "Receiver") to "immediately have and take possession, custody, and control of the business and all of the assets of [ICC ]" as a receiver. (Def.'s Ex. D, ECF No. 35-4.)  TAB Bank settled its claims against ICC thereafter. *Transp. All. Bank*, 2017 UT 55, at ¶ 5. ICC's other intervening creditors, however, did not. *Id.* Accordingly, the receivership remained open. *Id* at ¶ 6. Around that time, the Utah State Court permitted the Receiver to "sell, transfer, and liquidate" ICC's assets on its behalf. (Def.'s Ex. D, ECF No. 35-4.)

On December 17, 2014, MF Confections purchased ICC's assets from the Receiver for the sum of $2.15 million (the "Purchase Agreement"). (*Id.*) One of the individuals who negotiated the purchase on MF Confections' behalf was Z Capital's general counsel, Matthew Kane. (Kane Aff. at ¶ 17.) ICC's sole member, Michael Ryan, did not participate in the discussions. (Ryan Dep. 42:24-43:11.)

> The Purchase Agreement, in relevant part, contained the following release provision:
>
> Release of Claims.  Effective upon the Closing of the sale that is the subject of this Agreement, Seller [the receiver] on his own behalf and on behalf of [ICC] waives and releases any and all claims he or [ICC] may have against [MF Confections] and its employees, officers, directors, members, affiliates, and agents except for claims arising under this Agreement.

(the "Release Provision") (Def.'s Ex. D, ECF No. 35-4.) The Purchasing Agreement did not define MF Confections' "affiliates." (*Id.*) It did, however, state that all of its contents would be "governed by and construed and enforced with the internal laws of the State of Utah" (the "Choice-of-Law Provision"). (*Id.*)

On December 18, 2014, the Receiver filed an expedited motion to have the sale of ICC's assets approved by the Utah State Court. *Transp. All. Bank*, 2017 UT 55, at ¶ 11. The court agreed to hold a hearing and permitted ICC to object to the sale until December 22, 2014. *Id.* at ¶ 8. No objection came. *Id.* Thus, on December 23, 2014, the Purchase Agreement was court approved. (*Id.*; Def.'s Ex. Z-1, ECF No. 7-2.)

**E. Procedural History**

After the asset sale was approved, ICC sued MF Franchising in the Federal District Court for the District of Utah for unlawfully terminating the Licensing Agreement. *Transp. All. Bank*, 2017 UT 55, at ¶ 10. Shortly thereafter, however, ICC dismissed its complaint voluntarily, opting instead to reopen litigation in the same state court that approved the Purchase Agreement. *Id.* at ¶ 11. There, ICC unsuccessfully moved to "reactive the case and allow [ICC] to file objections" to

the Receiver's expedited motion to have the Purchase Agreement court approved. *Id*. After its motion was denied, ICC appealed to the Utah Supreme Court, which affirmed on the basis of mootness. *Id.* at ¶¶ 13, 23.

On September 25, 2018, ICC filed the instant action against Z Capital in this Court, accusing Z Capital of tortiously interfering with the Licensing Agreement and Consent to Collateral Assignment by "instructing" MF Franchising "to falsely declare a default." (Compl., ECF No. 1, at ¶¶ 1, 17-20.) On December 11, 2018, Z Capital moved for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 7.) That motion was denied on September 17, 2019. (ECF No. 17.)

Before this Court denied Z Capital's motion for dismissal, it stayed all discovery proceedings. (ECF No. 16.) After its judgment on Z Capital's motion to dismiss, the parties submitted, and the Court approved, an amended case schedule which required them to conduct discovery related to the following issues by December 31, 2021: (1) whether the Z Capital Defendants "fall within the scope" of the Purchase Agreement's Release Provision and (2) "application of the statute of limitations." (ECF No. 28.)

On March 5, 2021, Z Capital moved for summary judgment. (Def.'s Mot., ECF No. 35.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has

the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. ANALYSIS

Z Capital moves for summary judgment on two separate grounds. First, it argues that there is no "genuine" dispute that the Purchasing Agreement's Release Provision categorically bars ICC's tortious interference claim. (Def.'s Mot., ECF No. 35.)  Moreover, it contends that ICC's

claim is time-barred by its corresponding statute of limitations.  (*Id.*)  Either route, it asserts, entitles it to judgement as a matter of law.  (*Id.*)

Insofar as Z Capital's first argument is concerned, the Court agrees. In other words, the record demonstrates that there is no "genuine" factual issue that Z Capital fell within the ambit of the Purchase Agreement's Release Provision. *See Celotex*, 477 U.S. at 323 (citation omitted). And that provision bars ICC's sole tortious interference claim. Thus, summary judgment is proper.

### A.  Z Capital's Release Argument

### 1.  Applicable Law

When federal courts are asked to interpret a contract in a diversity action, they "will generally enforce the parties' contractual choice of governing law," provided that it is enforceable. *Express Packaging of OH, Inc. v. Am. States Ins. Co.*, 800 F. Supp. 2d 886, 890 (N.D. Ohio 2011) (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). Here, neither party disputes the basic validity or enforceability of the Purchase Agreement's Release Provision or Choice-of-Law Provision.[1] That is, they do not presently dispute that, once the Purchase Agreement went into effect, ICC "waive[d] and release[d]" any pre-existing claims that it "may have against" MF Confections and "its employees, officers, directors, members, affiliates, and agents," or that the Purchase Agreement's contents are to be "governed by and construed and enforced with the internal laws of the State of Utah."  (Def.'s Ex. D, ECF No. 35-4.)  They simply disagree as to whether, under Utah law, Z Capital constituted an "affiliate" of MF Confections

---

[1] ICC has already unsuccessfully tried to have the Utah Supreme Court retroactively strike the Release Provision from the Purchase Agreement. *See Transp. All. Bank*, 2017 UT 55, ¶ 20, 432 P.3d 1171 (noting that ICC's claim "can succeed only if we allow it (at the very least) to strike the release provision from the purchase agreement, or to void the purchase agreement entirely" but that, ultimately, "we have no authority to grant that relief on this appeal").

when the Purchase Agreement went into effect. Accordingly, the Court will apply Utah's substantive law to resolve the dispute. *See Savedoff*, 524 F.3d at 762.

### 2.  Z Capital's URBCA Argument

Part of the parties' dispute over the Release Provision gravitates around the *type* of Utah law that governs the Purchase Agreement. Z Capital argues that Purchase Agreement both implicitly and explicitly incorporated the Utah Revised Business Corporation Act (the "URBCA")—and, thus, that the URBCA's definition of the term "affiliate" controls. *See* Utah Ann. Code § 16-10a-102(d) (defining an "affiliate" as any "person [*i.e.*, business entity] that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, the person specified"). ICC argues—and the Court agrees—that is not the case, given that (1) the URBCA's definitions "apply only for purposes of that Chapter of the Utah Code," rather than for contractual purposes, and (2) the parties did not specifically reference the URBCA in the Purchase Agreement.

### a.  Analysis

Z Capital contends that the Choice-of-Law provision implicitly incorporated the URBCA into the Purchase Agreement because it "has always been recognized that a contract contains, implicitly, the laws existing at the time it is completed." (Def.'s Reply, ECF No. 37 at PageID #422) (citing *Wills v. Regence BlueCross BlueShield of Utah*, No. 2:07-cv-616, 2008 WL 4693581, at *15-16 (D. Utah Oct. 23, 2008)). Indeed, as Z Capital points out, "[the] concept of incorporating *applicable* existing law into a contract is not novel or unique to the law of Utah." *Id.* at *16 (emphasis added). Z Capital's argument falls short, however, because it has not demonstrated that the URBCA—which governs the formation and mechanics of Utah corporations—is "applicable" to the Purchase Agreement—which is a contract for the sale of assets between various *limited*

*liability companies* ("LLCs"). Indeed, it would be hard pressed to do so, given that Utah has enacted a separate LLC statute which does not appear to define the term "affiliate." *See* Utah Revised Uniform Limited Liability Company Act, Utah Ann. Code § 48-3a-101, *et seq.*

Nevertheless, even if the Purchase Agreement did not implicitly incorporate the URBCA, Z Capital contends that it explicitly did so via the Choice-of-Law Provision. (*See* Def.'s Reply, ECF No. 37 at PageID #433) (arguing that the Choice-of-Law Provision was "more than sufficient to incorporate the Act"). This argument, too, is unpersuasive.

Utah courts, as most state courts do, interpret contractual language "to ascertain the intentions of the parties to the contract." *Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2013 UT 12 ¶ 10, 322 P.3d 620 (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank*, 2002 UT 88, ¶19, 54 P.3d 1139. The ambiguity of a contractual term or provision (or lack thereof) hinges on whether it is "capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (quoting *WebBank*, 2002 UT 88, ¶ 22, 54 P.3d 1139).

Here, Z Capital must, at the very least, demonstrate that the Choice-of-Law provision is reasonably "capable" of being interpreted to incorporate the URBCA. *See id.* It has not. As ICC notes, nowhere in the Purchase Agreement is the URBCA referenced. Nor has Z Capital offered any persuasive evidence that the URBCA is "applicable" to contracts *like* the Purchase Agreement, or that the parties to the agreement intended the Choice-of-Law Provision to incorporate the URBCA. *See Wills*, 2008 WL 4693581, at *16.

Accordingly, Z Capital's URBCA argument is not well taken.

### 3. Z Capital's "Plain Meaning" Argument

Z Capital argues that, even if the URBCA does not define the word "affiliates" in the Purchase Agreement, the term's "plain meaning"—which, according to Z Capital, is analogous to its URBCA definition—does. (Def.'s Mot., ECF No. 35 at PageID #265-67) (arguing that the "commonly understood meaning" of the term "affiliate" involves either direct or indirect control by another entity *or* association under "common ownership or control"). ICC agrees with Z Capital that the "plain meaning" of "affiliates" applies. It does not, however, agree with Z Capital's interpretation of the word. (Pl.'s Resp., ECF No. 36 at PageID #372-73.) Instead, it argues that the term "affiliate" ordinarily does not refer to entities that are under "common ownership"—only those that are "associated . . . as a subsidiary, subordinate, or member." (*Id.*)

In other words, to invoke the Release Provision, Z Capital contends that it need only demonstrate that, at the time the Purchase Agreement came into effect, either (1) that it "directly or indirectly" controlled MF Confections or (2) that both it and MF Confections were directly or indirectly controlled by the same entity. (Def.'s Mot., ECF No. 35 at PageID #265-66.) That, obviously, is a broader test than the one ICC proposes, which would require Z Capital to demonstrate that MF Confections and Z Capital were associated through a "subsidiary, subordinate, or member relationship." (Pl.'s Resp., ECF No. 36 at PageID #372-75.)

Accordingly, the Court must determine which of the parties' proffered interpretations of "affiliate," if any, aligns with the term's basic meaning. *Daines*, 2008 UT 51, ¶¶ 25-27, 190 P.3d 1269; *see also Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428 (noting that a party's proffered interpretation "must be plausible and reasonable in light of the language used," rather than a "forced or strained construction" of a given term or provision). And that analysis, to a certain

11

degree, is contingent on the circumstances "surrounding" the word's use in the Purchase Agreement. *See Daines*, 2008 UT 51, ¶¶ 25-27, 190 P.3d 1269 (holding that, when a court must determine whether an undefined contractual term is "facially ambiguous"—that is, whether a term is "capable of more than one reasonable interpretation"—it must "consider the writing in light of the surrounding circumstances," but must not allow evidence of those circumstances to "create ambiguity where the language of a contract would not otherwise permit") (quoting *Ward v. Intermountain Farmers Ass'n.*, 907 P.2d 264, 268 (Utah 1996)) (internal quotation marks omitted)); *see also Saleh*, 2006 UT 20, ¶ 17, 133 P.3d 428.

### a. Dictionary Evidence

As both parties observe, courts usually turn to dictionary sources as an initial means of ascertaining an undefined term's ordinary meaning. *See, e.g., Kuhn v. Retirement Bd.*, 2015 UT App 18, ¶ 13, 343 P.3d 316. Of course, in this age, it is not hard to find sources that offer conflicting definitions of the same word. And, here, Z Capital and ICC prove that notion. Z Capital, for its part, offers two dictionary sources—Webster's Third New International Dictionary and Black's Law Dictionary—which support its broad "common ownership or control" interpretation. (Def.'s Mot., ECF No. 35 at PageID #266); *Affliate*, Webster's Third New International Dictionary 35 (2002) ("a company effectively controlled by another or associated with others under common ownership or control"); *Affiliate*, Black's Law Dictionary 67 (9th ed. 2009) ("[a] corporation that is related to another corporation by shareholders or other meanings of control; a subsidiary, parent, or sibling corporation) (emphasis added). ICC, in response, offers two different sources— Merriam-Webster.com and TheFreeDictionary.com—which, it contends, support a narrower concept of the term. (*See* Pl.'s Resp., ECF No. 36 at PageID #372); *Affiliated*, https://www.merriam-webster.com/dictionary/affiliated ("closely associated with another

typically in a dependent or subordinate position"); *Affiliate*, TheFreeDictionary.com, https://www.thefreedictionary.com/affiliate ("A person, organization, or establishment associated with another as a subordinate, subsidiary, or member.").

Z Capital points out that "ICC's reliance on the 'TheFreeDictionary.com' should be viewed with skepticism because of its questionable reliability." (Def.'s Reply, ECF No. 37 at PageID #434) (citing *Kraft v. Old Castle Precast, Inc.,* No. LA-CV15-00701-VBF, 2016 WL 4120049, *8 (C.D. Cal. Aug. 2, 2016) (noting that the website is a "relatively rarely-cited online source")). Perhaps so. In any event, the Court need not dwell on that point. The main takeaway here is that, in a vacuum, the dictionary "evidence" offered by both parties—while perhaps slightly favoring Z Capital's interpretation—does not conclusively favor one interpretation over the other. *See Fundamental Admin. Servs. v. Patton*, 504 Fed. Appx. 694, 700 (10th Cir. 2012).

### b. Legal Precedent

Z Capital provides three cases where a federal or state court has found the term "affiliate" to encompass entities that fall under "common control." (*See* Def.'s Mot., ECF No. 35 at PageID #266-67) (citing *Mey v. DIRECTV, LLC,* 971 F.3d 289, 389 (4th Cir. 2020); *Securus Tech. Inc. v. Global Tel\*Link Corp.*, 676 Fed. Appx. 996, 999 (Fed. Cir. 2017); *Bond Safeguard Ins. Co v. Dixon Builders I, LLC*, Twelfth Dist. Butler No. CA2011-02-027, 2012-Ohio-3313, ¶ 38). These are all somewhat persuasive, though not decisively so, as none directly involves a Utah court's interpretation of "affiliate." *See id.*

Another persuasive case—which was decided after the parties' briefing on the instant motion concluded—is *United States v. United Park City Mines Co. et al.*, -- F.Supp.3d--, 2021 WL 3862082, *2-*4 (D. Utah. Aug. 30, 2021). There, the District Court of Utah was tasked with resolving the precise scope of the term "affiliated" as it appeared in various Environmental

Protection Agency ("EPA") information requests. *United Park City Mines Co.*, 2021 WL 3862082, at *1. Part of that inquiry, as here, required the court to determine the term's ordinary meaning. *Id.* at *3-*4. To that end, the corporate defendants—like ICC—argued that, ordinarily, the term is "narrowly" defined to include organizations that are "closely associated with another[,] typically in a dependent or subordinate position."[2] *Id* at *3-*5. The EPA, by contrast, argued for the same expansive definition that Z Capital argues for here. *See id.* at *3.

Ultimately, the court adopted the EPA's "broad" approach. *Id.* In so doing, it largely looked beyond the dictionary definitions the parties offered, and, instead, sought to ascertain the context in which the term was used.[3] *Id.* Accordingly, it evaluated (1) how the defendants had used the term "affiliates" in the past (*i.e.*, whether they used the term "broadly" or "narrowly") and (2) whether "other statutes and regulations" embraced either of the parties' dueling interpretations. *Id.* at *3-*4. Both analyses favored the EPA. *See id.* at *4 (noting that "[t]he common thread in the preceding examples is that an affiliate is any entity that directly or indirectly controls, is controlled by, or is under common control with another entity"). And, as discussed *infra*, they do likewise for Z Capital.

ICC, by contrast, does not offer any caselaw where a court conclusively found that its "narrow" interpretation of "affiliate" constituted the term's ordinary meaning. Instead, it cites one case—*Patton*—in an attempt to undercut Z Capital's proffered interpretation. (Pl.'s Resp., ECF No. 36 at PageID #372-73.) In *Patton*, the United States Courts of Appeals for the Tenth Circuit

---

[2] Unlike ICC, however, the *United Park City Mines Co.* defendants conceded that their "narrow" definition enveloped entities that did not maintain a superior-subordinate relationship. *See United Park City Mines Co.*, 2021 WL 3862082, *2 (noting the defendants' concession that their proffered definition of "affiliate" enveloped an organization's "parent entity['s], *any sister entities under common control of the parent entity*, and any subsidiaries") (emphasis added).
[3] Notably, part of the *United Park City Mines Co.* court's holding was influenced by the fact that the EPA had already defined certain affiliates of one of the defendant entities, which added further context to the dispute. *See United Park City Mines Co.*, 2021 WL 3862082, *2. As described, however, the court relied on other contextual clues as well. *See id.* at *3-*4.

14

affirmed a district court's finding that it could not conclude as a matter of law that the plaintiff-appellants—two LLCs known as "FAS" and "FCC"—were "affiliated" with a nursing center (the "Hobbs Entity"). *See Patton*, 504 Fed. Appx. at 699-700. This was so even though FAS and FCC argued that their owner—THI of Baltimore, Inc.—also controlled the Hobbs Entity through an intermediary. *Id.* ICC implies that this outcome demonstrates that an entity cannot be "affiliated" with another entity when there are "two degrees of corporate separation between" them. (*See* Pl.'s Resp., ECF No. 36 at PageID #373.) That, however, is not what the *Patton* court held. As Z Capital correctly points out, *Patton*'s outcome was dictated by the fact that FAS and FCC failed to provide any "legal authority or evidence" to support their proffered interpretation. *Patton*, 504 Fed. Appx. at 700. Nor, at the district court level, did they even proffer an interpretation of the term. *Id.* at 699. Here, by contrast, Z Capital *has* provided legal authority and contextual evidence to support its proffered interpretation. (*See* Def.'s Mot., ECF No. 35 at PageID #264-68.) Thus, *Patton*'s outcome is not germane to the inquiry at hand.

The most materially applicable part of *Patton*, it seems, is the Tenth Circuit's acknowledgement that the various dictionary definitions of "affiliate" were "inconclusive" of the term's meaning. *Id.* That, as discussed above, is also the case here. But that is not the end of the story. Rather, as noted, the Court must also evaluate "any relevant evidence" regarding the context in which the term was written to understand its meaning. *Daines*, 2008 UT 51, ¶ 26-27, 190 P.3d 1296; *Ward*, 907 P.2d at 268; *accord Deal v. United States*, 508 U.S. 129, 132 (1993) (noting the "fundamental principle" of linguistic interpretation that "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). Only then can the Court determine whether one (or both) of the parties' proffered interpretations is "reasonably supported by the language of the contract." *Daines*, 2008 UT 51, ¶ 26, 190 P.3d 1296.

### c. Contextual Evidence

Z Capital identifies several contextual landmarks to demonstrate that the parties to the Purchase Agreement intended the term "affiliates" to refer to all entities that fell under "common control" with MF Confections. First, it points to the testimony of its General Counsel, Matthew Kane, who helped negotiate the Purchase Agreement on MF Confections' behalf. (Kane Dep. 61:18-62:15; Kane Aff. at ¶ 17-20.) According to Mr. Kane, MF Confections "expressly bargained for the Release to ensure that all litigation would be extinguished" against both it and any entity above it on the organizational ladder—including Z Capital. (*See* Kane Aff. at ¶ 19.) He adds further that:

> The Purchase Agreement does not include a specific definition of "affiliates" because "affiliates" has a well-known meaning. Both Utah law . . . and the common meaning of that word in many states and industries all encompass the same common meaning. That common meaning is universally understood, especially by those actually involved in the transaction that resulted in the Purchase Agreement. That common meaning is understood to include entities that are controlled by or under the common control of another entity.

(*Id.* at ¶ 20.) Importantly, Mr. Kane also notes that "Z Capital's private equity business treats Z Capital as an affiliate of its portfolio companies (including Mrs. Fields)" in its filings with the United States Securities and Exchange Commission ("SEC"), for other "regulatory filings, and for programs such as the Payroll Protection Programs under the CARES Act." (*Id.* at ¶ 22.)

Indeed, as Mr. Kane's testimony alludes, and as the *United Park City Mines Co.* court found, numerous "statutes and regulations" define the term "affiliate" to refer to entities which, directly or indirectly, fall under "common control." *See United Park City Mines Co.,* 2021 WL 3862082, at *4. Among these, as discussed, is the URBCA. *See* Utah Ann. Code § 16-10a-102(d). But also included are various SEC and Department of State regulations, the U.S. Bankruptcy Code, and Delaware's corporate statute. *See* 11 U.S.C. § 101(2)(B) (defining "affiliate" to include any "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly

owned, controlled, or held with power to vote, by the debtor, *or by an entity that directly or indirectly owns, controls, or holds with power to vote*, *20 percent or more of the outstanding voting securities of the debtor . . .*") (emphasis added); 17 C.F.R. § 230.405 (defining "affiliate" as "a person that *directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with*, the person specified") (emphases added); 17 C.F.R. § 240.12b-2 (same); 22 C.F.R. § 120.40 (same); Del. Code Ann. tit. 8, § 203(c)(1) (same).

### d. Conclusion

All told, it appears that the term "affiliate" (or "affiliates") largely operates as "a corporate term of art." *United Park City Mines Co.*, 2021 WL 3862082, at *3 (citations omitted). And, here, Z Capital has given the Court unrebutted context which shows that the term's use in the Purchase Agreement operated as "corporate parlance" for "any entity that directly or indirectly controls, is controlled by, or is under common control with MF Confections." *See id*. By the same token, it has shown ICC's proffered interpretation to be a product of "forced or strained construction," rather than a natural, context-based reading of the Release Provision.[4] *Saleh*, 2006 UT 20, ¶ 17, 133 P.3d 428 (noting that a party's proffered interpretation must be "plausible" in light of the language used and that "words and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests").

---

[4] This is further illuminated by ICC's own theory of liability. Central to ICC's tortious interference claim is its allegation that Z Capital, via its control of Mrs. Fields Famous Brands, "actively direct[ed]" MF Franchising to "falsely declare" that ICC defaulted on the Licensing Agreement. (*See* Compl., ECF No. 1 at ¶¶ 18-20; Pl.'s Resp. to Def.'s Interrog., ECF No. 35-3 at PageID #320.) This implies a "subordinate" relationship which, even under ICC's interpretation of the term, would seemingly render Z Capital an "affiliate" of MF Franchising (and vice versa). Notably, ICC concedes that Mrs. Fields Famous Brands *also* owns MF Confections. (Pl.'s Resp. to Def.'s Mot., ECF No. 36 at PageID #374.) If, as ICC argues, Z Capital levied its control over Mrs. Fields Famous Brands to cause MF Franchising to effectively do its bidding, it stands to reason that it could do the same with MF Confections. (*Id.*) That, too, would render MF Confections "subordinate" to Z Capital—and, thus, qualify the two entities as "affiliates" under MF Confections' proffered definition. The only way to avoid this conclusion is to read ICC's interpretation of "affiliate" to essentially require a direct or near-direct "subsidiary, subordinate, or member" relationship. But even ICC's own sources do not appear to define the term that narrowly. (*See id.* at PageID #372) (citing dictionary sources that require an entity to be "*associated*" or "closely *associated*" with another entity) (emphasis added). Nor is that interpretation consistent with the other caselaw, statutes, and regulations identified in this Opinion and Order.

### 4. Z Capital Constitutes MF Confections' "Affiliate"

Having determined the term's basic meaning, the Court must now determine whether Z Capital has demonstrated that there is no "genuine issue" that it was MF Confection's "affiliate" when the Purchase Agreement went into effect. *Celotex*, 477 U.S. at 323. This inquiry turns on MF Confections' structural relationship to MF Confections when the Purchase Agreement was court approved. To that end, the undisputed record demonstrates the following:

At all relevant times, James J. Zenni, Jr. ("Mr. Zenni")—Z Capital's CEO, President, and Founder—has stood atop Z Capital's corporate hierarchy.  (Kane Aff. ¶ 4; Kane Dep. at 32:13-16; Pl.'s Ex. A, ECF No. 36-1.)  Specifically, Mr. Zenni serves as the sole member and sole trustee of an unnamed Delaware liability company and family trust (the "Parent Entities"), both of which own Defendant Z Capital Group.[5]  (Kane Aff. at ¶ 4.)  Z Capital Group, as the "mothership" of Z Capital's investment activity, owns Defendant Z Capital Partners—the company's private equity hub—which, in turn, owns Z Capital Partners UGP, LLC.  (*Id.*; Kane Dep. 31:8-15; Ryan Dep. 7: 21-23, 17:2-3, 25:19.)  Z Capital Partners UGP, LLC, owns both of the general partner entities that control, respectively, Z Capital's first and second Funds (*i.e.*, "Fund I" and "Fund II").  (Kane Dep. 28:23-29:9) (*see also* Pl.'s Ex. A, ECF No 36-1 at PageID #400) (noting that Fund I and Fund II's general partners are Z Capital entities that have controls their respective funds "since such funds' inception").  Collectively, Fund I and Fund II own Famous Brands Holdings, LLC, a holding company which owns MFOC Holdco, Inc. ("MFOC Holdco").  (*Id.* at 24:12-25:3; Kane Aff. at ¶ 8.)  MFOC Holdco, through a series of other "intermediaries," ultimately owns and controls Mrs.

---

[5] Defendant does not disclose the names of these entities, assumedly because they wish to keep them confidential. (*See* Kane Dep. 31:21-32:8.)  In any event, Plaintiff does not dispute their existence. (*See* Pl.'s Resp., ECF No. 36 at PageID #364.) The Court notes, however, that, were this case to proceed further, Z Capital would be required to move to have the names of the Parent Entities sealed to prevent their disclosure—a request that would not appear to be justified based on the record before this Court.

Fields Famous Brands, LLC—which, in relevant part, owns both MF Franchising and MF Confections.  (*See* Kane Dep. 22:15-25:7; Kane Aff. at ¶ 8.)

### a.  Analysis

The foregoing structure demonstrates that, if one were to trace MF Confections' rather tortured chain of control, they would pass through Z Capital and, ultimately, arrive at the Parent Entities. In other words, it suggests that Z Capital and MF Confections have, at all relevant times, fell under "common control"—and, thus, constituted "affiliates" of one another when the Purchase Agreement came into effect.

ICC does not dispute or factually rebut any of the evidence regarding Z Capital's corporate structure. Instead, it asserts that Z Capital has not met its burden to demonstrate that it constitutes MF Confections' "affiliate" for purposes of the Release Provision because (1) "Z Capital offers only conclusory assertions" instead of "factual evidence demonstrating its purported control over" MF Confections; (2) "[t]he only owner of [MF Confections] is its sole member, Mrs. Fields Famous Brands," and (3) "[a]ssuming that Mr. Zenni [via the Parent Entities] in fact 'controls' [Z Capital], the record contains no evidence of what control he exercises, if any, over Mrs. Fields Confections."  (Pl.'s Resp., ECF No. 36 at PageID #374-75.)

As the movant, Z Capital must demonstrate, based on the record, that there is no "genuine" factual issue that it falls within the ambit of the Release Provision. *See Celotex.* 477 U.S. at 323; *Anderson*, 477 U.S. at 255. As discussed, that demonstration hinges on Z Capital's function and corporate structure. The record contains both testimonial and documentary evidence relating to those topics, including (1) the sworn affidavit of Matthew Kane—who, as Z Capital's General Counsel since 2014, has personal knowledge regarding Z Capital's corporate hierarchy and the way it legally structures its funds (Def.'s Ex. B., ECF No. 35-2); (2) Mr. Kane's deposition

testimony (Pl.'s Ex. 1, ECF No. 36-1); and (3) a twenty-four page "Firm Brochure" that Z Capital provided its outside investors in 2016 (Pl.'s Ex. A, ECF No. 36-1). All of those sources support Z Capital's central premise: that, at all relevant times, it has directly or indirectly controlled MF Confections—or, at the very least, had the same ultimate owner.  (*See* ECF Nos. 35, 37.)

Nevertheless, ICC's remaining arguments effectively disregard the evidence of Z Capital'gs corporate structure. Nor, as Z Capital points out, does ICC acknowledge the consistency of its *own theory of liability* with that structure. Take, for instance, ICC's assertion that Z Capital has not met its requisite burden because "[t]he only owner of [MF Confections] is its sole member, Mrs. Fields Famous Brands."  (Pl.'s Resp., ECF No. 36 at PageID #374.)  This contention ignores both (1) the evidence of the corporate hierarchy that exists *above* Mrs. Fields Famous Brands and (2) ICC's own allegation that Z Capital tortiously interfered with the Licensing Agreement *through its control* of Mrs. Fields Famous Brands. (*See* Compl., ECF No. 3 at ¶¶ 18-20; Pl.'s Resp. to Def.'s Interrog., ECF No. 35-3 at PageID #320) (alleging that Z Capital "instruct[ed] Famous Brands" to have MF Franchising "get out of the licensing agreements"). So too do the rest of ICC's arguments.

In any event, despite ICC's assertion otherwise, Z Capital need not prove that either it or the Parent Entities actually actively managed (*i.e.*, "exercised" control) over MF Confections to prevail. All that it must prove is that Z Capital and MF Confections fell under common "ownership" when the Purchase Agreement became effective. *See United States Park Mines Co.*, 2021 WL 3862082, at *3 (refuting the defendants' argument that "shared management or ownership" does not equate to "common control" because "'[m]anagement' and 'ownership' are both forms of control.")  Even when construed in ICC's favor, the record demonstrates just that.

Thus, on multiple fronts, Z Capital has carried its burden to demonstrate that there is no "genuine" factual issue that it fell within the purview of the Release Provision, and ICC has failed to properly shift the burden back with "specific facts." *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 250. Accordingly, because ICC's tortious interference claim does not arise from the Purchase Agreement itself—but, rather, from conduct that allegedly preceded it—it is barred by the Release Provision.  (*See* Compl., ECF No. 1; Def.'s Ex. D, ECF No. 35-4.)

### B.  Z Capital's Statute of Limitations Argument

Because the Court finds that the Release Provision bars ICC current claim, the Court need not opine on Z Capital's additional argument that the claim is barred by the statute of limitations. (*See* Def.'s Mot, ECF No. 35 at PageID #261-64.)

## IV.  CONCLUSION

For the foregoing reasons, Z Capital's Motion for Summary Judgment is **GRANTED**. (ECF No. 35.)

This case is to be closed on the docket of this Court.

**IT IS SO ORDERED.**


<u>3/28/2022</u>                                            <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                                   **EDMUND A. SARGUS, JR.**
                                                           **UNITED STATES DISTRICT JUDGE**